714   Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

Rapid Transit Subway Construction Company, Plaintiff, *v.*
The City of New York, Defendant.

Supreme Court, New York County, April —, 1927.

Municipal corporations — claims under contract for construction of
subway in New York city — claim for underpinning of buildings based
on entire front footage of buildings underpinned allowed — plaintiff
limited to amounts of demand in claims — though city directed use of
concrete in construction of piers, plaintiff is entitled to payment for
piers constructed of rubble stone — claims for concrete used for street
base and for wood sheathing' disallowed — plaintiff not entitled to
payment for such parts of sidewalks restored as are occupied by gratings
and vault lights — claim for construction of drains and culverts dis-
allowed — temporary location of water main was not laying pipe " in
place "— claim for raising of sidewalk grade occasioned by widening
Lexington avenue disallowed— claim for laying street surface at cross
streets allowed — increased cost of underpinning buildings along line
of construction cannot be charged to city on ground city did not give
immediate assent to work — plaintiff could have underpinned without
city's approval — delay in completion of work not attributable to city
— evidence shows plaintiff delayed construction to advance interests of
railroad company — interest allowed on claims from date of demand
for payment — moneys and securities deposited under contract draw
interest from date of plaintiff's demand on city for payment — plaintiff
entitled to value of bond which city omitted to turn over to it.

In this action by plaintiff to recover moneys claimed to be due it from the city of
New York, under the provisions of a contract for the construction of the Lexington
avenue subway from Forty-third to Fifty-third streets and for damages alleged
to have been caused by breaches on the part of said city, a claim for payment
for underpinning of buildings, done pursuant to said contract, predicated on
the entire front footage of every building underpinned, regardless of the nature
or extent of the underpinning work, must be allowed with interest where the
contract specifically provides that the specified prices for underpinning " are
per lineal front foot of building underpinned."

However, this claim and other items of claim are only allowed to the extent of the
amount of plaintiff's demand in the claim presented by it to the comptroller
of the city under section 261 of the Greater New York charter, since a claimant
is limited to the amount of his claim presented to the comptroller in the first
instance.

Plaintiff is entitled to be compensated for the underpinning of a building situated
in a side street, not at a subway station, where the contract recites that where
it is necessary to underpin a building where the excavation " projects into a
transverse street, as at stations,   *   *   *   the lineal front foot measurement
will be increased by the measurement in such transverse street within the limits
of the railroad;" the words " as at stations " are illustrative only.

Plaintiff's claim for payment for rubble stone masonry piers supporting street
railway tracks must be allowed where plaintiff, in keeping with the provisions
of the contract, constructed the piers of rubble stone notwithstanding the fact
that the city's engineers, as an economy measure, ordered plaintiff to use con-
crete instead of rubble stone; plaintiff was justified in ignoring the order for

Rapid Transit Subway Const. Co. *v.* City of New York. 715

Misc. 714]                    Supreme Court, April, 1927.

substitution of material where the city, coupled with the order for the use of concrete, directed that plaintiff should charge for the work at the rubble unit, since the condition the city sought to impose was unwarranted.

Plaintiff's claim for payment for concrete used for the concrete base under the asphalt it laid in its street surface restoration work, cannot be allowed, in view of the fact that all street surface in question was upon a concrete base when plaintiff commenced construction.

A claim for payment for wood sheathing, additional concrete and back fill in constructing a vent chamber at a street intersection, cannot be allowed, where it appears that the plaintiff's method of doing the work was adopted to serve its own convenience and that the work and materials covered by the claim were not required by any provision of the contract.

A claim for payment for excavation work done in excavating a transformer section for a sewer, based upon work plaintiff did not do, but which it would have done had it followed the city's plan, must be disallowed.

A claim for payment for sidewalk restoration predicated on such parts of restored sidewalk as are occupied, not by pavement, but by gratings and vault lights already paid for at contract prices, should be disallowed, since the contract never intended that the plaintiff should receive pay as for pavement of such parts of the sidewalk as were not to be paved by it, but were to be actually occupied by gratings and vault lights.

A further claim for payment for the construction of drains, culverts and culvert connections, not intercepted by a proposed sewer and based on a provision in the contract that " all existing sewers, culverts, drains and house connections intercepted by the proposed sewers * * * shall be connected with the new work by proper curves and grades " must be disallowed, though the line of the new sewer did not bring it into direct contact with the house drains as they originally lay. The contract was intended to refer to all drains whose flow led to the sewer as it originally lay.

A claim for such portions of ducts as lay within manhole lines must be disallowed, where plaintiff's sole basis for the claim is predicated upon the counting of the manhole space as duct footage.

Plaintiff cannot recover payment for the temporary location of a water main on the basis that it is so entitled for work done by it in taking up the pipe and temporarily maintaining it above the roadway, pending the final laying, as ordered by the city's engineers, where the evidence indicates that plaintiff's method of construction was dependent upon its own convenience alone; the fact that the pipe was suspended on chains above the roadway does not warrant a finding that the temporary hanging of the pipe was a " laying in place " under the terms of the contract.

Additional claims for payment for new curbing at street corners, for laying water pipe, and for material and labor, under the contract, are allowed.

A claim for laying a designated number of square yards of sidewalk at a specified price per square yard, necessitated by the widening of Lexington avenue, on the ground that the raising of the sidewalk grade took the work out of the class of work for which, under the contract, no payment was to be made, must be disallowed, since the provisions of the contract permitting the city to order the widening of Lexington avenue must be construed as having been to recompense the plaintiff for any work and materials necessarily performed and furnished by it over and beyond those it would have been required to perform and furnish if the avenue had not been widened.

A claim for laying a designated number of square yards of street roadway surface at intersecting cross streets entirely outside of the ordered net lines of excavation,

will be allowed, where it appears that the surfacing referred to was made necessary to create a proper slope into the intersecting streets to meet the raised grade of Lexington avenue.

Claims predicated on the laying of sidewalk surface, including curbing and maintenance, and for building barricades around hydrants and lamp posts, are allowed under the circumstances.

Plaintiff is not entitled to payment for the increased cost of underpinning buildings along the line of construction, on the ground that the delay occasioned by the city's engineers forced plaintiff to actually outlay more than it would have been compelled to expend had the engineers given their consent to underpinning when plaintiff determined that it was necessary, in the absence of anything in the contract showing that plaintiff could not have underpinned without the consent of the city's engineers, particularly in view of the fact that underpinning to protect property owners would, in many instances, be a matter of pecuniary concern to the contractor only.

Nor is plaintiff entitled to damages alleged to have been caused by reason of delays on the part of the city's engineers in the timely delivery of plans from which plaintiff could order and set the steel required in compliance with the contract, where the evidence not only shows that any delays that might be found to be attributable to the city did not lessen plaintiff's ability to complete the work within the contract period, but also that the delay in the completion of the work was attributable to the plaintiff by reason of the fact that in constructing the subway it was a mere agency or instrumentality of the railroad company which would operate the subway; the evidence shows that under the railroad company's orders and in order to advance the financial interests thereof, plaintiff deliberately and intentionally proceeded slowly in order to cause the very delay in the completion of the contract of which it now complains.

Interest on allowed claims for principal indebtedness is allowed, but only from the date the demand for payment was made and not from the respective dates of the filing of the claims with the city. The same rule should apply as to interest on moneys, and on securities taking the place of money, retained by the city after the completion of the contract work.

The plaintiff is entitled to the value of a bond which the city omitted to turn over to it, and which seems to have been lost or destroyed, on the theory of conversion, with interest to date from the date when the other bonds were turned over.

ACTION by subway contractor to recover moneys alleged to be due under a contract and for damages claimed to have been caused by breaches on the part of the defendant city.

*James L. Quackenbush* [*Albert J. Kenyon* of counsel], for the plaintiff.

*George P. Nicholson, Corporation Counsel* [*Charles V. Nellany, Frank R. Rubel* and *Charles Blandy* of counsel], for the defendant.

MULLAN, J. The plaintiff was awarded by the city the contract for the construction of section 7, route 5, of the Lexington Avenue subway, extending from the south side of Forty-third street to a point fifty feet north of the center line of Fifty-third street. After completion of the work the plaintiff brought this action to

Rapid Transit Subway Const. Co. *v.* City of New York.    717

Misc. 714]                Supreme Court, April, 1927.

recover moneys claimed to be due to it from the city under pro-visions of the contract, and as damages it alleges it was caused by breaches on the part of the city. The action originally came on for trial before Mr. Justice WAGNER, and it was stipulated that a jury should be waived, but that a jury should be deemed present, so that the disposition of the case could be made by way of the direction of a verdict, thus avoiding the need of findings. After Mr. Justice WAGNER had taken testimony for several days, an adjournment of indefinite length was agreed upon in order to afford opportunity to the parties to negotiate for the settlement of some at least of the plaintiff's claims. Several months elapsed, and counsel then reported that they were unable to come to any agree-ment, except as to certain minor items. Meantime Mr. Justice WAGNER had been designated to sit on the bench of the Appellate Division, and I consented to take over the trial, and did so take it over, upon a stipulation that the testimony taken before Mr. Justice WAGNER should be deemed to have been taken before me. After taking further testimony for several weeks, I decided that it would be advisable to order an adjournment pending the handing down by the Court of Appeals of its decision in the case of *Litchfield Construction Co.* v. *City of New York* (244 N. Y. 251), another subway case, in which the court had before it the question whether the city was liable for the acts and conduct of the Public Service Commis-sioners, and their employees, in and about the construction of the subways, the Rapid Transit Act having provided that subway con-struction, if resorted to by the city, must be under the control and supervision of the Commission as a State agency. The highest court having decided that the city, by its contracts with the contractors, voluntarily nominated the Commissioners and their employees as its representatives for the prosecution of the work, and that thus the city was liable for their acts and conduct to the same extent as if they were city officials and employees (*Litchfield Case, supra*), the trial was resumed and concluded. The volume of testimony was great, and the exhibits were many. In passing upon the numerous claims, I shall endeavor to be as brief as properly consists with a desire to lighten the burden of the appellate courts, to which this case will in all probability go.

*Claim No. 1.* (*For payment for side wall drains.*) This claim was settled as to principal, the city agreeing to pay the sum of $1,420.63, with interest. There is conflict of view as to the law governing the date from which interest should be computed. A similar controversy runs throughout the action, and I shall deal with it at the close of my memorandum, there passing upon all interest questions in one place.

Supreme Court, April, 1927.                    [Vol. 129

*Claim No. 2.   (For payment for underpinning of buildings.)*   This claim involves the construction of certain provisions of sections 69 and 70 of the contract in relation to the underpinning of buildings along the line of excavation.   In subdivision 2 of section 69 appears the following: " By underpinning is meant such method of construction as will transmit the foundation loads directly through the underpinning structure to such lower level as is necessary to secure the buildings and which will relieve the adjacent ground from improper lateral pressures.   The underpinning shall be designed to furnish a safe and permanent support for each independent building."   In section 70 it is provided that the specified prices for underpinning " are per lineal front foot of building underpinned." The plaintiff was paid at the contract unit price ($60 per lineal foot) for the lineal footage of the length of the *actual underpinning.* Its contention is that it should have been paid for the entire front footage of every building it underpinned, regardless of the nature or extent of the underpinning work.   Its counsel argues, for example, that if the corner, or other small part, of a building having a frontage of 100 feet is underpinned, at a cost no matter how trifling, the contractor would be entitled to receive payment in the sum of $6,000.   A literal reading of the price provision quoted undeniably supports that contention.   Its counsel concedes that plaintiff would receive a very considerable profit by the adoption of the construction it urges, and as there is no suggestion that the payment for underpinning it has already received was not compensatory, I am free to infer that the adoption of the city's theory would not entail an actual loss to plaintiff on this item.   Moreover, it was asserted by the corporation counsel, and not disputed by plaintiff's counsel, that the practical construction placed by the city and contractors generally on these underpinning provisions in subway contracts has always been that urged by the city in the instant case.   Nevertheless, although at first I was strongly inclined to a contrary view, I believe the plaintiff is entitled to the construction it contends for.   Some underpinning is of the pier type, in which a small area of actual underpinning supports a very much larger area of building frontage, and I have come to the conclusion that it was the intention roughly to average the cost, and that it is of no materiality that the contractor may in a given case be shown to have profited through the law of chance having run in his favor. Support to the literal meaning of the price provision is derived from the estimate of approximate quantities contained in the contract with respect to underpinning work.   It is there estimated that the underpinning for this section of the subway will protect 1,300 lineal front feet of buildings, 1,200 feet (buildings under

seven stores in height) at $60 per lineal foot, or $72,000, and 100 feet (buildings over seven stories in height) at $100 per lineal foot, or $10,000. The subway section covered by the contract runs from Forty-third street to Fifty-third street, making twenty blocks of approximately 200 feet each, counting both sides of the avenue. If the city's construction were to be adopted, the estimated footage of underpinning would be greatly in excess of probable need. Additional support is lent to the construction plaintiff contends for by a provision in section 449 of the contract, entitled "Special Matters," in which the following is to be found: "If it is found necessary to underpin * * * the retaining wall on the westerly side of Lexington Avenue along the New York Central and Hudson River Railroad Company's yard or property, the contractor * * * shall be paid for such underpinning * * * at the unit prices specified in the Schedule applicable to the several classes of work and material involved. * * * The prices stipulated in [naming the price items for underpinning] do not apply to the work of underpinning * * * said retaining wall." That provision furnishes argument for the connotation that all other underpinning work should be priced at an underpinning unit designed to operate arbitrarily and regardless of the amount of work and labor involved. This claim covers another item as to which the plaintiff should, I think, also succeed. Under that item the plaintiff claims payment for underpinning a building in a side street and not at a station. The contract provision applicable is as follows: "Where the railroad excavation projects into a transverse street, as at stations, and it is necessary to underpin or to maintain, protect and secure a building, the lineal front foot measurement will be increased by the measurement in such transverse street within the limits of the Railroad." (§ 70.) The city contends that side street underpinning may be compensated for only when the building underpinned is at a station. I rule with plaintiff, and hold that the words "as at stations" are illustrative only. I allow this entire underpinning claim, with interest, but only to the extent, as to principal, indicated presently.

The question arises under this and numerous other items of claim, whether the plaintiff may recover a greater sum than that named as the amount of its demand in the claim presented by it to the comptroller of the city, plaintiff contending that it may not be so limited, and the corporation counsel contending that in the case of contract claims the claimant is bound by his claim and cannot recover beyond it. In *Reed* v. *Mayor, etc.* (97 N. Y. 620) it was held that a complaint in an action against the city of New York to recover damages for personal injury might be amended

720 Rapid Transit Subway Const. Co. v. City of New York.

Supreme Court, April, 1927.                         [Vol. 129

by increasing the amount of the demand. In its short *per curiam* memorandum the Court of Appeals, construing the then existing provision of the city's charter relating to the presentation of claims to the comptroller (Laws of 1873, chap. 335, § 105), the source and precursor of the present section 261 of the Greater New York charter, said that " the claim in this case being for unliquidated damages for a personal injury, * * * the provision of the charter * * * was sufficiently complied with * * * and * * * he [plaintiff] is not restricted in his recovery to the estimated amount of damages stated in the claim so filed; that in such a case the estimate of the amount of damages is not an essential part of the claim required to be presented to the comptroller." By section 261 of the Greater New York charter it is provided that all claims against the city must be presented to the comptroller. " This," said Ingraham, J., in *Williams* v. *City of New York* (130 App. Div. 182, 191), " is to give the comptroller the necessary time to make the proper investigation and provide for the payment of the claim." By section 149 of the charter it is provided that the comptroller may examine the claimant under oath. In *Tolchinsky* v. *City of New York* (164 App. Div. 636) it was held that these two sections should be read together, and, as so read, " it is apparent that it was the intention of the Legislature that the comptroller should have, in addition to the power to adjust and settle claims, and as incident thereto, the right to examine the claimant to ascertain whether or not an adjustment or settlement ought to be made." In *MacArthur Brothers Co.* v. *City of New York* (N. Y. L. J. July 1, 1926) it was held, by Mr. Justice Proskauer, that in the case of a contract claim presented to the comptroller setting forth in detail the several items of damage the claimant then rested upon, the claimant could not recover for an item not referred to in the claim. Strangely enough, there does not seem to be any reported case directly bearing upon the question whether the amount of any item in a contract claim may be raised after the claim has passed out of the comptroller's jurisdiction, and has been sued upon. I am of the opinion that the legislative scheme of safeguarding the city against improper demands upon its treasury was intended, in respect of contract claims, to limit the claimant to the amount of his claim as presented to the comptroller, and that in that way only can the legislative purpose be accomplished. The reasoning underlying the decision in the *Reed Case (supra)* connotes, I think, the propriety of a contrary holding in a contract action, where the damages are either certain, or capable, theoretically at least, of being made certain. Even as to a personal injury claim the Court of Appeals seems to have been divided, as

the opinion contains the statement that " a majority of the judges "
were of the opinion that the amount of the claim could be raised.
It is argued by plaintiff's counsel that the city's employees had
all the essential facts in their possession, and thus that the city's
rights would not be jeopardized by an increase in the amount of
its claim.   I think that is a wholly immaterial consideration, that
would, in many cases, if allowed to enter into the question, lead
to much uncertainty and controversy, and possible fraud, with the
result of impairing seriously the safeguarding value of the charter
provisions.   I have no doubt that obvious errors at the expense of
the claimant, such as calculations appearing on the face of the claim
to be erroneous, and other errors that readily come to mind but
which I need not stop to mention, may be corrected, but no such
question arises in connection with any of the claims dealt with
in this action.   Here, the comptroller was justified in assuming
that the totals of the several claims were the sums the plaintiff
desired to stand upon, and I rule that as to this and other claims
the amount of which the plaintiff desires to raise above the amount
named in the demand upon the comptroller, I have no power to
permit the increase.

*Claim No. 3.   (For payment for rubble stone masonry piers sup-
porting street surface railway tracks.)*   The contract drawings called
for rubble stone construction of these piers.   The contract unit
price for rubble is lower than for concrete, but rubble work requires
more material, and is for that reason actually a more costly type
of construction.   The Commission's engineers, as an economy
measure, ordered plaintiff to use concrete instead of rubble.   They
had the right of substitution under the contract, but they coupled
their order with a condition that plaintiff should charge for the
work at the rubble unit.   Plaintiff refused to comply because of
that condition, and constructed the piers of rubble.   The defendant
admits liability, but insists that it should be permitted to pay at
the concrete unit.   As the condition that the Commission's engineers
sought to impose was unwarranted, the plaintiff was justified in
ignoring the order for substitution, and is entitled to pay at the
rubble unit.   There was another ground of opposition to this
claim, but it seems to have been conceded that a decision in plaintiff's
favor in respect of the ground first referred to will be decisive of the
second ground.   This claim is allowed, with interest.

*Claim No. 4.   (For payment, as for concrete, for concrete base
installed in the restoration of street surface.)*   A necessary incident
of the excavation work was the tearing up and removal of a large
area of street surface.   The plaintiff was required, under the

46

722   Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

contract, " to restore the surface to a condition similar to, and equally as good as, that existing previous to the commencement of construction." (§ 420.) A general provision covering necessary incidentals is of similar import. (Art. X.) The plaintiff has been paid for its street surface restoration work at the prices fixed by the contract for street surface restoration. It seeks, however, by this claim, to obtain, as in payment for concrete, at the contract price for concrete, payment for the concrete base under the asphalt it laid in its surface restoration work. It seems to me that the ordinary meaning of the word " restore " and its derivatives, should compel a ruling against the plaintiff unless there be authority requiring a contrary holding. Plaintiff's counsel does rely upon a decision, in *Dady* v. *City of New York* (149 App. Div. 956; affd., with a modification not affecting the point here, 208 N. Y. 546) which does not, however, support its contention. The *Dady* case was tried before a referee, who found that in restoring pavements upon certain streets the contractor was ordered to, and did, lay a concrete base where there was no concrete base originally (Findings IV, V, VI and VII, fol. 287 *et seq.*, pp. 72, 73 of Vol. I of the record at the Court of Appeals); and he allowed payment for the concrete base at the concrete unit, and his ruling was affirmed in both appellate courts. The finding appears to have been, in point of actual fact, erroneous, and it was clearly shown upon the trial that some of the street surfaces there in question did have concrete bases before the contractor demolished the pavement in the course of his construction work. I must, however, be governed by the findings, and not by the evidence. In the instant case, all the street surface in question was upon a concrete base when the plaintiff commenced construction, as it was too when it made its bid. I am of the opinion that this claim is not well founded, and it is accordingly disallowed.

*Claim No. 5.* (*For payment for wood sheathing, and additional concrete and back fill in constructing vent chamber at Fifty-third street.*) In dealing with this item of construction, the contract calls for side walls of concrete two and one-half feet in width. The plaintiff actually constructed them to a greater width, and bases its claim for pay for the additional space upon the contention that the drawings and plans furnished it by the city would not have rendered the chamber waterproof if the waterproofing of the sheathing hereafter referred to was not left in place. The excavation made for this chamber was nine inches wider than was necessary. Plaintiff's contention is that it had intended to insert a form for the concrete between the side wall of the excavation and the line of the concrete wall, but that while the work was in progress it

was found to be necessary to sheath the side wall and waterproof it, and that when the time came for pouring the concrete, instead of inserting forms on the lines of the wall and pouring the concrete to these walls, it poured the concrete to the sheathing, using the side wall as its form. This method made it impossible to draw out the sheathing and take it away for further use, and it also necessitated some back fill. It is contended on behalf of the city that the plaintiff's method of doing this item of work was adopted to serve its own convenience, and that the work and materials covered by this claim were not required by any contract provision. I am of the opinion that the city is clearly right, and that this claim should be disallowed *in toto*. Accordingly, it is so disallowed.

*Claim No. 6.* (*For payment for remainder of runs in clay ductbanks.*) This claim was settled as to principal, the city conceding the justice of the claim to the amount of the demand made upon the comptroller, $5,985.50. It is accordingly allowed at that sum, with interest.

*Claim No. 7.* (*For payment for certain excavation work in excavating a transformer section for a six-foot circular sewer.*) The contract and working drawings concededly called for a particular type of excavation in connection with the item of work that this claim refers to. Plaintiff did not follow the instructions contained in the drawings, but elected to have recourse to a method of installing the transformer that answered all essential purposes, and was approved by the Commission's engineers, but which required much less excavation than would have been necessitated by compliance with the city's plan. It has been paid for the excavation work it actually did, but contends that it should also be paid for the excavation work it did not do, but which it would have done had it followed the city's plan. The only argument its counsel advances in support of that position is that the sum paid it by the city does not adequately compensate it for the work. It seems to me that the plaintiff's point is obviously untenable, and, accordingly, I disallow this claim.

*Claim No. 8.* (*For payment as for sidewalk restoration, for such parts of restored sidewalk as are occupied not by pavement, but by gratings and vault lights.*) The gratings and vault lights were paid for as such, at contract prices. Plaintiff contends, however, that it should be paid for paving the restored sidewalks as measured by outside lines that inclose designated sidewalk space. It bases its contention upon the provision of section 424 of the contract that " the measurement for payment for street surface restored will be to the ordered net lines of excavation." The plans upon which the bids were made showed the gratings and vault lights later installed by

plaintiff. I am of the opinion that the provision I have quoted, taken from section 424, must be read in connection with the provisions relating to payment for gratings and vault lights, and that as so read it becomes fairly plain that it was not intended that the plaintiff should receive pay, as for pavement, for such parts of the sidewalk as were not to be paved by it, but were to be and actually were occupied by gratings and vault lights. Plaintiff's counsel asserts and the corporation counsel admits, that the city always pays, and has paid here, for *roadway* restoration without deduction of space occupied by manhole and other opening covers, also paid for separately. That practice may have arisen because the space so occupied is relatively insignificant as compared with the entire superficial area of restoration. Whatever the reason, however, I cannot accept the city's practice in relation to roadway restoration as binding it by analogy to the construction contended for by plaintiff in relation to sidewalk restoration. Accordingly, this claim is disallowed.

*Claim No. 9. (For payment for the construction of drains, culverts and culvert connections, not intercepted by proposed sewer.)* The contract scheme for the payment for sewer construction was that the contractor would be paid for sewer laid by it at so much per foot, according to the size of the sewer, the charge for certain necessary incidental work to be reflected in the size of the sewer unit. It was provided in section 320 that "All existing sewers, culverts, drains and house connections intercepted by the proposed sewers, culverts or receiving basins shall be connected with the new work by proper curves and grades and in such manner as the Engineer shall direct; and all drains, basins or culverts rendered unnecessary or becoming disused by the work herein contemplated shall be filled in and made solid with good, wholesome earth in the manner directed." Under this claim the plaintiff seeks payment for the construction by it of drains, etc., the flow from which was taken by the new sewer it laid, wherever the line of the new sewer did not bring it into direct contact with the house drains, etc., as the latter originally lay. I presume I may judicially notice that house drains start from houses at different levels. While there was no proof made as to those starting levels, the position consistently maintained on behalf of the city, that the levels varied here, as generally throughout the city, was not seriously questioned by plaintiff's counsel. The theory of the plaintiff is that the word "intercepted" in its context should be construed as having been intended to refer only to such drains, etc., as occupied space later taken for and occupied by the new sewer. It is the city's contention that the word in its context refers to all drains

that led to the old sewer when subway construction began, and which were to be connected with the new sewer when laid.    The primary or etymological meaning of the word "intercept" seems clearly to support the city's position, and a consideration of the practical situation that the contracting parties must certainly have had in mind lends strong confirmation to that view.    Counsel on both sides refer me to definitions in engineering books of the term "intercepting sewer" none of which seems to be at all in point.    The plaintiff concedes that if the construction it seeks is not accepted, the claim must fall.    I accept without hesitancy the city's construction that the provision in question was intended to refer to all drains, etc., whose flow led to the sewer as it originally lay.    Accordingly, this claim is disallowed.

*Claim No. 10.   (For payment of such portions of ducts as lay within manhole lines.)*    It was provided in the contract (§ 62, subd. 1) that ducts were to be paid for at a specified sum per duct foot.    In cases where ducts led to and passed manholes, the ducts were discontinued at the near sides of the manholes, and were recommenced at the far sides.    Technically, therefore, although the manholes served, in practical effect, as ducts for the space of their occupancy by the cables, the manhole space should not be counted in calculating the duct footage.    Plaintiff contends, however, that a correct construction of section 62, read in its entirety, would entitle it to pay, as for ducts, for the manhole space.    It would serve no useful purpose to analyze the contract provisions in relation to ducts, for the reason that the identical question presented here was passed upon in *Hopkins* v. *City of New York*, by Mr. Justice DAVIS, who decided it in favor of the city, which holding was affirmed by the Appellate Division, beyond which court the case did not go.    (217 App. Div. 790; see record at page 442 of the case on appeal.)    This claim, therefore, is disallowed.

*Claim No. 11.   (For payment for first or temporary location of twenty-inch water main.)*    The plaintiff was paid for the final location and laying of this pipe at the contract price.    Under this claim it seeks to recover, as for a laying of this pipe, "in place," at the schedule unit of two dollars and fifty cents per foot for pipe "in place," for work done by it in taking up the pipe and temporarily maintaining it above the roadway, suspended on chains, pending the final laying in place as ordered by the Commission's engineers.    I am of the opinion that, whether or not plaintiff could have established a case under this claim if the claim had been rested upon another theory, it cannot recover under its theory that the temporary hanging of the pipe was a "laying in place," and that as that was the theory of its claim as presented to the

RAPID TRANSIT SUBWAY CONST. CO. *v.* CITY OF NEW YORK.

comptroller, the claim should be disallowed for that reason alone. Assuming, however, that the claim was presented to the comptroller, and was sued on here, on the correct theory of entitlement to pay, if at all, on a cost plus basis, the plaintiff has made no proof within that theory, nor would it, in the view I take of the proof plaintiff did make, be entitled thereunder to recover on the cost plus basis. It is contended by plaintiff that the work of temporary location and maintenance was necessitated by the delay of the Commission's engineers in furnishing final plans locating the laying line. The plan furnished by the engineers for the relaying of the southerly part of the main was, indeed, marked as a preliminary plan, but it was made a final plan immediately upon the request of plaintiff for a final plan. The plaintiff contends that the plan could not be treated as a final plan, for the reason that it was not sufficiently detailed to enable it to do the work, principally because the angles for connections were not stated in writing on the plan, or verbally. The plan was, however, drawn to scale, and the angles corresponded to the then standard angles commonly used in this class of work, namely, angles of twenty-two and one-half, forty-five and ninety degrees. I cannot escape the conclusion that this temporary hanging of the main was decided upon by plaintiff as a means of serving its own convenience, and was not forced by any delay on the part of the defendant. A somewhat stronger case was made out in respect of the northerly portion of the main lying along the line of this subway section, for as to it there was a considerable delay on the part of the city in furnishing a location plan, but as to that portion also, I think the plaintiff was serving its own convenience. It is true that it put itself on record as demanding that a plan be furnished, but there was a significant failure to follow that demand by further insistence that the plan be supplied. However, I need make no finding on the subject of responsibility for the necessity for the temporary hanging, for the reason that, as I have indicated, the claim was rested by plaintiff upon a construction of the words " in place " that defies the plain meaning of those words. This claim is disallowed.

*Item 1 of Exhibit B of Complaint. (Claim for payment for new curbing at street corners.)* The city concedes the propriety of this claim, and it is accordingly allowed in full, with interest.

*Item 2 of Exhibit B of Complaint. (Claim for payment for laying certain water pipe.)* This claim was settled as to principal, the city agreeing to pay the sum of sixty-six dollars and fifty-six cents, with interest.

*Items 3, 4, 5, 6 and 7 of Exhibit B of Complaint.* These claims

were settled as to principal, the city agreeing to pay the sum of $16,000, with interest.

*Exhibit C of Complaint.* (*Claim for payment for material and labor, under article XII of the contract, disallowed by city's engineers.*) The plaintiff's proof under this claim was adequate and convincing, and the city offered no opposing proof. This claim is allowed in full ($2,477.34), with interest.

*Paragraph 8 of Second Cause of Action.* (*Claim for payment for sidewalk and roadway restoration, and other work, necessitated by the widening of Lexington avenue.*) This claim contains demands for payment for three items of work and materials, and one item based on work alone, all resulting from the decision of the competent authorities of the city, made after the subway contract was let to the plaintiff, to widen Lexington avenue. A superficial depth of nine and one-half feet was taken off the sidewalk on each side of the avenue, and added to the vehicular roadway. To create a proper pitch, the crown of the roadway was raised, necessitating the raising of the sidewalk grade and the destruction of several feet in superficial depth of the surface of the roadway in the intersecting cross streets, and the regrading of those cross streets so as to slope their surfaces gradually to meet the new level of the avenue. *Item 1.* (*For laying 1,923.73 square yards of sidewalk at $3 per square yard.*) The sidewalk dealt with under this item was outside of the ordered net lines of excavation, and for that reason, because of certain contract provisions, could not have been charged for had the grade of the sidewalk not been raised. The plaintiff was paid, as for fill, for the filling work it did to raise the sidewalk grade. It now demands payment for the sidewalk surface restoration upon the ground that the mere circumstances of the grade being different, although concededly that difference added nothing to the cost, took the work out of the class of work for which, under the contract scheme, no payment was to be made. I am of the opinion that the contract provisions that permitted the city to order the widening of Lexington avenue must be construed as having been intended to recompense the plaintiff for any work and materials necessarily performed and furnished by it over and beyond those it would have been required to perform and furnish if the avenue had not been widened, and that it was not intended to allow the plaintiff to profit by the widening, as it would do if this item of the claim under consideration were to be allowed. The item in question is disallowed. *Item 2.* (*For laying 542 square yards of street roadway surface at $3 per square yard.*) This part of the claim is for payment for the laying of roadway at the intersecting cross streets, entirely outside of the ordered net lines of

728   Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

excavation.   The surfacing referred to under this item was ordered to cover the fill (paid for separately) necessarily used to create a proper slope into the intersecting streets to meet the raised grade of the avenue.   The corporation counsel admits that some payment should be made under this item, but contends that the area claimed by plaintiff as the proper space for measurement is unduly great.   I am of the opinion that adequate proof was made by plaintiff to justify its claim, and accordingly this item is allowed, with interest.   *Item 3.   (For laying 2,525 square yards of sidewalk surface, including curbing, and maintenance, at $3 per square yard.)* Although the widening had been decided upon and ordered, the engineers representing the city directed the plaintiff to restore, and it did restore, as sidewalk, the portion of the original sidewalk intended to be taken and later made part of the vehicular roadway. This was, for some unexplained reason, done as a temporary expedient.   It is plain that this item should be allowed unless it is to be ruled that the city is right in contending that the claim is covered by the provisions of section 422 of the contract.   The argument of the corporation counsel is that that section is broad enough in its scope to include the case of a portion of street area added, after the contract was let, to the original street area.   I think it is sufficiently clear that the provisions of section 422 were intended to relate merely to a substitution of one type of pavement for another type of pavement, and that there was no thought of making provision for the contingency of a necessity to construct pavement in an area not theretofore part of the same use-kind of street.   As a decision to that effect seems to leave the city without any defense to this item, it is allowed, with interest.   *Item 4. (For building barricades around hydrants and lamp posts.)*   The ordered widening of the avenue was followed by relocation of hydrants and lamp posts, and the protection of the traveling public required the barricading covered by this claim.   The very faint opposition of the city to this claim was not justified, and as the amount of the claim is concededly correct, it is allowed, with interest.

*Paragraph 9 of Second Cause of Action.   (Claim for payment for raising surface railroad tracks to a new and higher level, and for the raising of decking.)*   This claim was settled, the city agreeing to pay the sum of $11,217, with interest.

*Paragraph 10 of Complaint.   (Claim for payment for maintenance, etc., of flumes.)*   This claim was settled, the city agreeing to pay the sum of $666.62, without interest. .

*Paragraph 11 of Complaint.   (Claim for payment for drawing additional line holes.)*   This claim was settled, the city agreeing to pay the sum of $1,542.20, without interest.

*Fourth Cause of Action.* (*Claim for payment of increased cost of underpinning buildings on premises No. 497 Lexington avenue, and No. 119 East Forty-seventh street.*)    In March, 1915, the plaintiff's engineers, believing that the buildings here in question should be underpinned, applied to the Commission's engineers for approval of underpinning plans prepared by plaintiff's engineering staff. The Commission's engineers thought that underpinning was not necessary, and refused to give their approval.   Some considerable time thereafter, when it had become quite evident that the under-pinning operation should be resorted to, the Commission's engineers approved the plans, and plaintiff underpinned accordingly.   Under this claim plaintiff seeks to recover the difference in cost between its probable total expenditure had it underpinned when it first endeavored to procure the Commission's consent to underpinning, and its actual outlay when it did finally underpin.   Section 69 of the contract contains the following provisions: "The contractor shall secure buildings adjacent to the excavation.   *   *   *   The underpinning shall be designed to furnish a safe, and permanent support for each independent building.   To accomplish this result, the contractor shall use such methods of underpinning, pneumatic or otherwise, as special conditions may require and the [Commission's] Engineer shall approve.   *   *   *   Before the work is proceeded with, the contractor shall submit to the Engineer drawings in duplicate indicating the proposed typical and special methods of underpinning or of maintaining, protecting and securing the adjacent buildings."   In section 37 it is provided generally that all drawings, other than contract drawings, "shall be submitted to the [Commission's] Engineer for his approval."   The parties had agreed upon the general nature and extent of plaintiff's duty and legal liability in respect of the protection of adjacent and abutting buildings, by the incorporation in the contract of the following provisions:

"Article XLV. The Contractor expressly admits and covenants that the drawings and specifications and other provisions of this contract, if the work be done without fault or negligence on the part of the Contractor, do not involve any danger to the foundations, walls or other parts of adjacent, abutting or overhead buildings or structures or surfaces; and the Contractor will at his own expense make good any damage that shall, in the course of construction, be done to any such foundations, walls or other parts of adjacent, abutting or overhead buildings or structures or surfaces.   The liability of the Contractor under this covenant is absolute and is not dependent upon any question of negligence on his part or on the part of his agents, servants or employees, and the neglect

**730** Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927. [Vol. 129

of the Engineer to direct the Contractor to take any particular precautions or to refrain from doing any particular thing shall not excuse the Contractor in case of any such damage. It is the intention of the parties to this contract that in addition to indemnifying the City against all claims for damages, the Contractor shall also be liable to the owners of adjacent, abutting or overhead property, buildings or structures and to all tenants or occupants of such buildings or structures for all physical injuries to person or property which may be occasioned by the work of construction, even in cases where such owners, tenants or occupants have no legal claim against the City for such injuries."

Article XLV was construed in *Schnaier* v. *Bradley Contracting Co.* (181 App. Div. 538) as permitting the owner of a damaged building to sue the contractor directly.

It is the contention of the plaintiff that it could not have underpinned without the consent of the Commission's engineers. The city contends that, despite the provisions apparently requiring approval by the Commission's engineers before underpinning work could be prosecuted, the plaintiff's duty to protect and secure the adjacent buildings carried with it the absolute right to underpin whenever in fact underpinning was necessary; and that the only value to plaintiff of an advance approval of an underpinning operation was the procural in that form of an advance decision that the work was necessary, thus providing assurance to plaintiff that it would be paid for the work. I have reached the conclusion that the plaintiff could have underpinned without the consent of the Commission's engineers. Its liability to the owners of adjacent buildings was of so serious and drastic a character that it does not seem possible that it could have been intended that plaintiff should be compelled to abide by the opinion of the Commission's engineering staff, and thus run the risk of subjecting itself to heavy damage should that opinion prove by subsequent occurrence to have been unjustified. The whole underpinning scheme of the contract was obviously intended to serve two distinct purposes, the protection of property owners, and the protection of the subway structure. Underpinning to protect property owners would, in many cases, be a matter of pecuniary concern to the contractor only. Yet no distinction is made in the contract provisions between underpinning for that purpose, and underpinning to protect the subway structure. Whatever may be thought concerning an advance approval of plans to protect the subway, it is difficult to suppose that it was intended that the contractor would be powerless to protect the property owners, and thus protect himself, in case the Commission's engineers should refuse to accept the

opinion of the contractor's engineers that a given building was in need of underpinning. A similar question was passed upon by the United States Circuit Court of Appeals, Second Circuit, in *Dock Contractor Co.* v. *City of New York* (296 Fed. 377). There the contractor, operating under a subway contract substantially the same as that in the instant case in so far as concerns underpinning, sued for underpinning pay, and the city resisted upon the ground that the work was not necessary. There, too, the engineers representing the city had refused to sanction underpinning, and thereupon the contractor proceeded to underpin without approval, and the holding was that it could recover for the work at the contract price, upon a showing of necessity. It is urged by plaintiff's counsel that there is room for a distinction between the situation in the Federal case referred to, and that here, in that there the contract itself contained a stated test of necessity, while here necessity is made a question of general fact. That difference, however, only relates to the manner of proof of necessity, and does not affect the point here in controversy. In testifying concerning this item in the instant case, one of the plaintiff's engineers said that the reason for not proceeding when plaintiff first asked for approval, was fear that the plaintiff wou d not be paid for the work. This claim is disallowed.

*Claim for damages alleged to have been caused by delays on the part of the Commission's engineers in furnishing plans.* This is much the largest of the claims made by the plaintiff in this action. Under it the plaintiff seeks to recover the sum of $616,000 for losses said to have been suffered by it because of the increase of cost of labor and material, principally labor, over the necessary expenditure plaintiff would have been called upon to make at the earlier dates when, according to plaintiff, it should and would have made expenditure for the items in question except for delays caused by the city. Concededly, because of war-time conditions, the price of labor and materials steadily advanced during the progress of the work. The claimed delays that are the bases of this general item of damage were due, it is said, to the alleged failure of the city to make timely delivery of plans by which plaintiff could order and set the steel required for compliance with its contract obligations, the delay in procuring steel causing in turn numerous postponements of items of work, namely, excavation, setting of concrete, and restoration of street surfaces and subsurface structures. To the increase of cost of labor and materials caused by these postponements, is added the increase of cost of maintenance, supervision, rental value of plant and overhead. There is no claim for the increase of cost in setting steel, and it is conceded that the

Supreme Court, April, 1927. [Vol. 129

price of the steel itself was not advanced by the fabricating concern with which plaintiff had contracted for the purchase of all the steel it needed under the contract.

It is the contention of the city, *first*, that there were no delays that are properly attributable to it; *second*, that any delays that might be found to be attributable to it did not lessen plaintiff's ability to complete the work within the contract period; *third*, that the delay in the completion of the work was caused by the delay of the Interborough Rapid Transit Company (which, for brevity, I shall call railroad company) in furnishing track alignment plans, and that the railroad company's delay in that regard must be attributable to the plaintiff, which was owned, controlled and managed by the railroad company, and *fourth*, that the plaintiff, in order to advance the financial interests of the railroad company, and under that company's orders, deliberately and with intention proceeded slowly in order to cause the very delay in completion of which it now complains.

Adequately to understand the controversy arising under this claim, I think it would be well to state preliminarily the respective general positions occupied by the city, the plaintiff and the railroad company. The railroad company was a signatory to the contract, but only for the purpose of obligating it to the payment of a certain proportion of such sum as would be earned by the plaintiff by its performance of the contract terms. (Art. XXXV.) The railroad company had previously contracted with the city to operate the new subway lines when the subways structures would be built. It caused the organization of the plaintiff in order to bid for, and construct, if a successful bidder, several sections of the new subways. The plaintiff was wholly owned by, and was officered and managed by, the railroad company. Every employee it had was a railroad company employee. Although it was, of course, a separate legal entity, it was in fact as much a part of the equipment of the railroad company as was the chair occupied by the head of the railroad company in his presidential office. Any good coming to it was delayed in transmission to the railroad company only by the time spent in the appropriate bookkeeping. Any bad coming to it caused an immediate and direct loss to its owner. The wispiest and most diaphanous of theoretical veils separated it from its creator. In real life, it was as much a part of the railroad company as a man's arm is a part of the man. I shall hereafter discuss in greater detail a matter that, as I view the evidence, governs the decision in respect of this claim; for the present I shall refer to it generally. The railroad company was required to pass on the track plans, called alignment plans, for the new additions

to the subway system. Its engineers having to do with the subject and work of alignment were the identical engineers who were in charge of the construction work under the contract in suit. There was a great delay on the part of the railroad company in adopting an alignment. The duty of these engineers, while wearing the mental livery of the plaintiff, was to cause a hastening of the adoption of alignment plans. These same men, in the mental livery of their other employer, the railroad company, were working for a master that had no direct obligation, under the contract in suit, to do anything whatever concerning alignment plans. It would, of course, be no more than the enactment of a farce for Engineer A, as plaintiff's employee, to demand of himself, Engineer A, as the railroad company's employee, that alignment plans be adopted so as not to delay the construction work. It seems to me to be plain that the plaintiff in the doing of this work was " a mere agency or instrumentality " of the railroad company (*Chicago, M. & St. P. R. Co.* v. *Minn. Civic Assn.*, 247 U. S. 490, 501) and that the acts and conduct of the railroad company in connection with any material phase of the work in question may be considered and given weight as affecting the rights and duties of the plaintiff under its contract with the city. (*Berkey* v. *Third Avenue Railway Co.*, 244 N. Y. 84, 94, 95; *Chicago, M. & St. P. R. Co. Case, supra; Davis* v. *Alexander*, 269 U. S. 114.)

It is contended for the city that the railroad desired that there be delay in the construction work, for the reason that that delay would result in great financial gain to it. The operating contract under which it was to operate, as lessee, the new subway lines when constructed, was not to take effect until the new subway structures were completed. It was proved that in 1914, the year in which the construction contract in suit was executed, the railroad company's revenue from the old subway lines it was then operating, and which were to be tied up, physically and financially, to the new subway lines when the latter should be put in operation, was $17,560,557, of which the sum of $5,765,542 was available for dividends. This latter sum would have been reduced by $1,770,000 had the lease of the new lines been then in effect. In 1915 the revenue of the railroad company was $17,843,794, of which the sum of $6,167,413 was available for dividends. That latter sum would have been reduced by $2,170,000 had the lease of the new lines been then in effect. In 1916 the railroad company's revenue was $19,357,252, of which the sum of $6,852,646 was available for dividends. That latter sum would have been reduced by $2,850,000 had the lease of the new lines been then in effect. In 1917, when the

734 Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

lease, if there had been no delay in subway construction, would have gone into effect, the railroad company's revenue was $21,454,892, of which the sum of $7,255,691 was available for dividends. Had the operating lease been then in effect, this sum of $7,255,691 would have been reduced by the sum of $3,260,000. In 1918, when the operating lease should have been in effect, the railroad company's revenue was $21,840,447, of which the sum of $4,939,045 was available for dividends. That latter sum would have been reduced by the sum of $940,000 had the operating lease been then in effect. In 1919, the first year in which the operating lease covering the new lines actually was in effect, the railroad company's revenue was $24,632,207, but every dollar of that sum not used in necessary expenditures for operation was needed for compliance with the terms of the operating contracts, and there was not only nothing available for dividends, but there was a deficit of $202,572. Had the operating lease not gone into effect, there would have been available to the railroad company in that year for the payment of dividends the sum of $4,200,000. It is thus seen that whether or not the railroad company did, or omitted the doing of, anything, for the purpose of causing delay in construction, its interest lay strongly on the side of delayed construction. In further and more direct proof that the railroad company was desirous of delay, the city called one of the assistants to the corporation counsel, who testified that, after this action had been brought, a certain engineer who had been one of plaintiff's engineering staff in charge of the construction work on this section, had applied to the corporation counsel to be retained by the city as an expert for it in its defense of the action, and had in fact been so retained, told the witness that Mr. Shonts, the president of the plaintiff and of the railroad company, had frequently instructed the engineer to " go slow " in the construction work, for the stated reason that delay would benefit financially the railroad company, and that on every occasion when Shonts so instructed the engineer orally, Shonts wrote the engineer a letter instructing him to " speed up." The engineer, who, after his retainer by and work for the city, returned to the employ of the plaintiff, and testified for it as an expert in this action, denied *in toto* the story of the assistant corporation counsel. I accept as true, without the slightest hesitancy, the testimony of the assistant corporation counsel, but I give no credence whatever to anything said by the engineer at any time, because of his peculiar notion of professional ethics.

The execution of the contract was completed by delivery on August 7, 1914. The plaintiff therein agreed to complete the work on March 7, 1917. Actual completion occurred some time

in November, 1918.   My task is to decide how much, if any, of that delay is attributable to the city, as represented by the engineers of the Public Service Commission, and, if some but not all be so attributable, to discover the sum that is properly chargeable to the city as representing the loss sustained by the plaintiff.   As I have said, the plaintiff's basic grievance, from which all its other grounds of complaint flow, is that the engineers of the Commission delayed in furnishing data from which the plaintiff could order the manufacture of the steel required for the work.   That delay, it is urged, not only postponed the work of setting the steel, but also postponed the work of excavation necessarily done before the steel could be set, and that postponement, it is said, caused the other postponements complained of.   The contract provides: " Section No. 18.   No work shall be begun until the Commission shall issue to the Contractor a permit authorizing him to proceed.   No permits for excavation will be issued until the Contractor has given satisfactory assurance to the Engineer that the structural iron and steel and other material needed for construction will be available.   The Contractor must conduct his work so as to avoid advancing the excavation at any place ahead of the delivery on the work or on property owned or leased by the City of the structural iron and steel required for such place, unless otherwise permitted by the Engineer.   If the Contractor elects and is permitted to advance the excavation ahead of such iron and steel delivery, it will become necessary for him to support and maintain the trenches until the iron and steel can be obtained; this he shall do entirely at his own risk and expense.   The permits are to be in such form and shall cover such portions of the work as the Commission shall prescribe." No formal permission was given to plaintiff to proceed with the excavation work before the steel was on the ground, or immediately available, but, for reasons I shall presently refer to, plaintiff did voluntarily so proceed with the tacit acquiescence and approval of the Commission's engineers.   Its legal position in respect of this choice of methods of procedure became, therefore, the same as if plaintiff had formally elected, under section 18 of the contract, to advance the excavation ahead of the steel delivery, and had received the permission of the Commission so to do.   The contract scheme for the furnishing by the Commission of the necessary working data, was that " working " drawings would be first furnished by the Commission which would be worked out by the plaintiff into an average of about fifty drawings of details, called " shop drawings," and these shop drawings would upon completion be submitted to the Commission's engineers for their approval.   (I am using, as to drawings, the nomenclature employed by Judge LEHMAN

in the *Litchfield* case.) In the case of shop drawings for the steel work, it was the practice of the plaintiff to cause them to be made for it by the American Bridge Company, with which steel fabricating concern the plaintiff had contracted for the manufacture of the steel it needed. The first working drawing for steel was sent to plaintiff on October 15, 1914, and while plaintiff contends that it should have received it by September 9, 1914, it concedes that that delay did not occasion any postponement of the work. The section of the subway covered by the contract was divided into seven subsections, and each subsection was treated as a separate unit requiring its own working and shop drawings. The delay of which plaintiff complains relates to the working drawings for the six subsections other than that the working drawings which were received, as has been said, on October 15, 1914. It became necessary from time to time to revise the shop drawings for steel after their preparation by the bridge company, and their subsequent transmission to the Commission's engineers. Plaintiff's counsel specifically concedes that such revisions were contemplated by the plaintiff when it entered into the contract, and that thus it has no cause for complaint based on the loss of time caused by any of the revisions made. The complaint as to delay must rest, therefore, on a claim of delays in furnishing original working drawings. Several months before the contract in suit was executed, the railroad company had entered into its operating contract with the city, the well-known contract No. 3, under which contract it had been agreed that tentative track alignment plans were to be sent to the railroad company by the Commission, and that these plans were to be returned with approval or disapproval within ten days from their receipt by the railroad company. The city sent these plans to the railroad company on April 23, 1914, but they were not returned until March 3, 1915, at which time the railroad company approved these plans with changes so slight that had the steel been fabricated on the basis of these plans it could all have been used. Throughout the fall of 1914 the Commission's engineers were demanding of the railroad company that it take a position respecting the tentative alignment by either accepting the city's proposed plans or making suggestions of necessary or advisable changes. During this period there were numerous conversations and discussions concerning alignment taken part in by all the engineers concerned, but these negotiations proved abortive for the reason that the railroad company was insisting upon a change of alignment to admit of a cross-over on the adjoining section to the south (under the Grand Central Station), the placing of which cross-over at that point was subsequently shown, and

Rapid Transit Subway Const. Co. *v.* City of New York. 737

Misc. 714]                        Supreme Court, April, 1927.

practically admitted by the railroad company's engineers, to be faulty and bad engineering, for the reason that the proposed cross-over would have been on a curve in the road. When, in December, 1914, it had become apparent that the delays being caused by the railroad company's delay in pinning itself down to definite alignment plans, would inevitably occasion delay in the construction work, the plaintiff was permitted, in the informal manner I have referred to, to proceed with its lateral excavation work, employing the timbering process customarily adopted when excavations are made in advance of the arrival of the steel. It is admitted for the plaintiff that at the beginning of the prosecution of the excavation work, the city had not, either by act or omission, caused any delay. The work proceeded smoothly and without untoward incident, until the end of September, 1915, at which time the plaintiff was well within the time limit set by its own working schedule. In late September, 1915, on another (Seventh avenue) branch of the new subway, there was a serious cave-in at a point where the contractor for that section had been excavating by the timber process then being used by the plaintiff here. The Commission's engineers shortly thereafter revoked their permission to the plaintiff to excavate by the timber process (except at one of the shafts), and required strict compliance thereafter with the provisions of section 18 of the contract. When the timber excavation was stopped, plaintiff had done seventy-three per cent of the excavation work it had to do. When the alignment plans were finally approved by the railroad company (on March 3, 1915) the Commission's engineers proceeded at once to prepare working drawings for the second to seventh, inclusive, subsections, the drawings for the first subsection, it will be recalled, having been sent by the city to the plaintiff on October 15, 1914. The second delivery of working plans for a subsection was made by the city in June, 1915. Plans for three additional subsections were delivered in July, 1915. In October, 1915, the city delivered plans for the sixth subsection, and the plans for the seventh and last subsection were delivered on December 2, 1915. These various plans were subjected to the same process of handling I have described in reference to the first set of plans received by the plaintiff on October 15, 1914, and there were frequent necessary revisions. The first delivery of steel thereafter arrived on the ground on February 3, 1916, and the steel deliveries followed steadily thereafter until, on July 5, 1916, all the steel required was on the ground. Until the cave-in, and the resulting revocation of permission to timber-excavate, the absence of steel caused no delay, or at least

47

738   Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

no delay attributable to the city, as plaintiff was devoting the full energy it desired to apply to construction, to its excavation work, and was not requesting working plans for the reason that it did not then need them because of the general scheme of its operation as shown by its election under section 18 of the contract to excavate ahead of steel deliveries. When that general scheme of operation was necessarily abandoned by it because of the revocation of the permission to timber-excavate, plaintiff was forced to fall back on strict contract compliance, and as it thus could not excavate in advance of steel deliveries, it was for the first time in need of additional working drawings, and it called for the sixth and seventh sets of drawings, and the sixth set was delivered on October 15, 1915, a few days after the cave-in, and the seventh and last set of drawings was received by the plaintiff on December 2, 1915. There would thus appear to have been as to this last set a delay of a few days attributable to the city. It is of significance, however, that the steel called for to supply that last subsection was delivered to plaintiff in such a sequence of items that the first installment, which arrived on the ground on April 27, 1916, was not usable until the steel sent in the last installment, which arrived on July 5, 1916, had been set, and that the steel in that last arriving installment was the steel that should first have been set in that subsection. It also appears that no steel whatever was set in this subsection until July 21, 1916. Whether the peculiar chronology of delivery I have referred to was the result of inefficiency or intention on the part of plaintiff's engineers, or resulted from arbitrary selection by plaintiff's steel fabricator, the American Bridge Company, does not appear, but it most certainly has not been made to appear, nor is it claimed, that the order of delivery is in any way attributable to the city.

The plaintiff's claim is that the entire twenty-month delay in completion of its contract work is attributable to the city. After a laborious analysis of the great volume of evidence upon this claim I am of the opinion that the plaintiff has not laid the delay of a single day at the city's door. Assuming for the moment that the contract required (until shown to be dangerous) the timber type of excavation, instead of the cut and set steel type, the very most that could be said for the plaintiff's case, as I view the evidence, is that the city possibly delayed a few days in transmitting the working drawings for the seventh and last subsection. But it will have been seen that resort to the timber type of excavation was taken only because of the delay of the railroad company in passing on the alignment plans. Until those plans had become final, the steel drawings could not be made. In the *Litchfield Case (supra)* it

was found by the trial court that the contractor there, who also was delayed in his work because of a similar delay in receiving from the railroad company its approval of alignment plans, and who also was thereby compelled to resort to the timber type of excavation, did not elect so to do, but was forced so to do, the city's obligation under the contract being to procure the alignment plans promptly. If, therefore, the plaintiff here was not a part of the railroad company, I should be under the necessity of deciding whether the city's possible delay in furnishing the shop drawings for the last or seventh subsection entitled plaintiff to some recovery under the damage proofs. As I have found that a complete dominion (see *Berkey* case, at p. 95) was in the power of, and was exercised by, the railroad company, over its creature, the plaintiff, I am compelled to rule that the delay in respect of alignment plans was attributable to the plaintiff because attributable to the railroad company. As that delay necessitated the adoption of the timber type of excavation, and as the plaintiff proceeded so to excavate, without any present need of steel until October, 1915, there is no proof in this record, nor could there be in the nature of the case, to show that there would have been any delay in the sending by the city of drawings, or that any such possible delay would have delayed the general work, had the final alignment plans been on hand in August, 1914, when the contract in suit was executed, and before which time the final alignment plans should have been approved by the railroad company. I make no findings as to the assertion by the city that the railroad company deliberately endeavored to delay the construction work. I do, however, find that the whole general scheme of construction was changed as a direct result of the railroad company's delay in respect of the alignment plans, and that the only possible untimeliness of the city shown, that in connection with the delay in furnishing the drawings for the last subsection, cannot be said to have been the cause of a delay in the general work for a similar or any period. Had the cut and set steel type of excavation been resorted to originally, as the contract primarily required, the steel may very possibly have been on hand at the times at which it should have been set. At least, there is nothing, nor could there be anything, to show that the steel would not have been on hand, or that any slight delay in furnishing plans would have prevented completion within the contract period, or would have caused any material delay in completion, regardless of the contract period. I think it is plain that, if I have ruled correctly in deciding that the plaintiff was the agent or servant of the railroad company, and thus that the track alignment delay may be attributed to plaintiff, any damage

740   Rapid Transit Subway Const. Co. *v.* City of New York.

Supreme Court, April, 1927.                    [Vol. 129

award to plaintiff under this claim would necessarily be based on the wildest conjecture and speculation. As the trier of the facts I find for the city on this claim, and it is accordingly disallowed.

*Interest on claims hereinbefore allowed; other interest claims; and claim upon the loss of a bond.* It will have been noticed that I have allowed interest on all claims as to which I have found in plaintiff's favor. There are additional interest demands made by plaintiff that form claims of themselves, *i. e.,* not as additions to items of principal, but as claims for sums that should be paid, according to plaintiff's theory, merely as interest. I shall first consider the question of interest upon the allowed claims for principal indebtedness. It is the contention of plaintiff that interest should run from the respective dates of the filing of these claims with the engineer of the Public Service Commission. It is the contention of the corporation counsel that interest should run from a date thirty days after the filing of the claim with the comptroller of the city of New York. I am of the opinion that, at the present time, the law upon the subject is thoroughly settled. In *O' Keeffe* v. *City of New York* (176 N. Y. 297) the Court of Appeals was called upon, in a contract action, to determine the date from which interest should run. It was argued for the plaintiff there that interest should be allowed from the date of the maturity of the claim, *i. e.,* the date of completion of the work, under the general and well-understood principle that interest ordinarily runs from the date when the principal sum becomes due and payable. The court held that interest ran only from the date of presentation of the claim to the comptroller, saying: " It would be exceedingly difficult for the comptroller of a large city to look up claimants or their heirs or assigns and tender payment as their claims matured and became due. If interest at six per cent is chargeable from the date of the maturity of claims many persons might refrain from presenting them during the period permitted by the Statute of Limitations. The allowing of interest from such maturity would afford a safe and profitable investment which might become very attractive to many and induce them to buy up claims for the purpose of holding them for the interest. This would impose a burden upon the city that it ought not to bear. The better and more just way is to follow the rule laid down in *Taylor* v. *Mayor, etc., of N. Y.* (67 N. Y. 87, 94) and *Sweeny* v. *City of New York* (173 N. Y. 414) and award interest on claims only after the demand of payment has been made." In the case of claims against the city of New York, a statute makes the comptroller of the city the officer to whom claims must be presented. (Greater N. Y. charter, § 261.) In *Smith* v. *Board of Education of the City of New York* (208 N. Y.

Rapid Transit Subway Const. Co. *v*. City of New York. 741

Misc. 714]                    Supreme Court, April, 1927.

84) it was explained that the ruling in the *O' Keeffe* case was not based upon any statutory requirement, but " rather on the consideration that it would be inconvenient and burdensome for the officials of a municipality to seek its creditors and tender payment of their claims, and also that it would be oppressive and unjust to permit creditors of a municipality with good credit to turn claims into investments through omitting to present them and then collecting interest thereon." It was also there observed, by way of dictum, that it was competent for a municipality expressly to provide in a contract that interest would run from a certain date other than the date of the presentation of a claim to the official competent to receive it on behalf of the municipality. The holdings and opinions in those two cases thus make it plain that when the debtor is a municipality the debt (where there is no express agreement to the contrary), although in a theoretical sense due upon the maturity of the claim, does not actually and in a practical sense become due until a claim upon it has been made to the proper municipal official; and that, therefore, interest upon the debt must be reckoned from the date upon which the debt has been made actually due and payable by such presentation of claim. Plaintiff's counsel argues, however, that the opinions in those cases do not mean what ·I think they appear very clearly to say, and cites many cases some of which I shall presently discuss. He contends that when the city has agreed that a payment will be due at a certain fixed time, or at a time capable of being made certain by a showing that work was done, or in a case where a representative or agent of the city, such as the engineer of the Public Service Commission, either did, or wrongfully refused to, certify that work was done, it would be unjust to permit the city to escape the full burden of its obligation by exonerating it to the extent of the interest between the date of maturity of the claim as so fixed or fixable, and the date of the presentation of the claim to the comptroller. The Appellate Division of this department, in *Roebling's Sons Co.* v. *City of New York* (110 App. Div. 366), was, indeed, moved by a similar argument, to date interest back to the time when the claimant's claim had matured under the terms of the contract. There the plaintiff, which had built a bridge that had been accepted as complete and satisfactory by city officials competent to act in that regard on behalf of the city, was denied a certificate of completion by the city's engineer. The engineer should have certified to completion on November 15, 1902. The plaintiff presented its claim to the comptroller on July 23, 1903. It was held that the engineer's refusal to certify was " wrongful and unlawful," that the city could not profit by its own wrong,

and that the case for the plaintiff there thus stood legalistically as if the city's engineer had acted properly and certified to completion, upon the theory that the law will regard that as done which ought to have been done, from which, it was said, it followed that the plaintiff was entitled to interest from December 15, 1902. Although that case was decided in 1905, two years after the O'Keeffe decision was handed down, the court was apparently unaware of the O'Keeffe holding. The *Roebling* case did not go beyond the Appellate Division. It is impossible to reconcile the Roebling decision with those of the higher court in the *O' Keeffe* and *Smith* cases, and I am constrained to regard it as definitely overruled. Plaintiff's counsel seems to stress the importance of the contract provisions in the *Roebling* case, and in the instant case, by which the maturity of claims is made determinable by the certificates of overseeing or checking officials representing the city. On plain principle, however, that type of fixation can have no solemnity over the fixation by the precise calendar dates, and in the *Smith* case the court had the latter type of fixation before it. There a teacher in a city school was entitled to a certain salary at the end of each calendar month. The sum of five dollars per month was improperly deducted from each of several salary payments. Surely, if ever there were a case where an exception to the general rule might possibly be made, so as to permit the running of interest from the date of the maturity of claim, that was the case; but the Court of Appeals adhered rigidly to the rule, and held that interest ran from the date of presentation of the claim and not from the date of the maturity of the claim. Nor can I see any reason for the cry of hardship said to be worked by the rule so laid down. A claim matures on a given day. The fixation of that day may be easy or difficult, but that consideration has to do merely with proofs, and cannot affect the principle of the rule. The day of maturity thus being fixed, the claimant may cause interest to start running at once by the simple expedient of doing at once what he must do ultimately, *i. e.*, by presenting his claim to the competent and proper official of the municipality. Plaintiff's counsel also places reliance upon the holding in *Shepard* v. *City of New York* (216 N. Y. 251), but the only question considered by the court in that action was whether, by accepting, under protest, a part of his salary as a clerk in a city department, the plaintiff waived interest on the remainder. Reference is made by the court in its opinion to the fact that the plaintiff protested to the head of his department against the salary reduction, which protest, with other acts, are mentioned by the court as having preserved plaintiff's rights. Plaintiff's counsel urges that that

reference supports his contention that the making of a claim to an official other than the financial officer of the city competent to receive claims starts interest running from the day of filing a claim with, or making a demand upon, such other type of official; but it is very plain, I think, that the court's intention in making mention of the protest to the department head was merely to point out that such protest had its bearing on the question of intentional waiver of interest, and thus that the protest was referred to merely as one of the facts that should have moved the trial court to send the question of waiver to the jury, instead of passing on the issue as one of law and dismissing the complaint. The plaintiff also relies upon the holding in *McGovern* v. *City of New York* (235 N. Y. 275). The trial court in that action allowed interest from the dates of the presentation by McGovern of his claims to the engineer of the Public Service Commission, and that ruling was modified and affirmed by the Appellate Division (202 App. Div. 317). The Court of Appeals subsequently modified and affirmed the determination of the Appellate Division. The interest question seems to have been lost sight of in both appellate courts. A motion was made by the city at the Court of Appeals for a reargument, and while that motion was in form denied, the court ordered the return of the remittitur and corrected the dates from which interest had been allowed by it by changing them to the dates of the presentation of the claims to the comptroller. (236 N. Y. 508.) In conclusion upon this point, I think it will suffice to say that the Appellate Division and the Court of Appeals have recently ruled upon the question here discussed, in a subway case where the contract was generally similar to that here; and that the holding followed the *O'Keeffe* and *Smith* decisions and limited the contractor to interest from the date of the presentation by it of its claim to the comptroller. (*Litchfield Construction Co.* v. *City of New York*, 216 App. Div. 517; 244 N. Y. 251.) The city is wrong, however, in contending that interest should start running from a date thirty days after demand has been made upon the comptroller. Its contention is based upon the ruling in *Ryan* v. *City of New York* (179 App. Div. 181, 193; and see, also, *Leopold* v. *City of New York*, 184 id. 244), but that decision was made at a time when it seems to have been thought, despite the holding of several years previous in the *Smith* case, that the interest question was so affected by the provisions of section 261 of the Greater New York charter as to require a holding that interest should not start running upon a claim until the comptroller had had it in his hands for a period of thirty days. As was explained by Mr. Justice FINCH in his

Supreme Court, April, 1927. [Vol. 129

opinion for the Appellate Division in the *Litchfield* case, those charter provisions bear only on the right to sue. The only effect they have on interest is that, because of them, a claim is not payable until demand has been made upon the comptroller, and, therefore, interest cannot start running before the date of that demand. Accordingly, interest is to be reckoned from the respective dates of the several demands upon the comptroller.

I now come to the question of interest on moneys, and on securities taking the place of money under certain contract provisions allowing that to be done, retained by the city after the completion of the contract work. The principal sum here in question, including the value of the securities, is $457,500. Of that, the sum of $200,000 was returned to the plaintiff even before demand was made upon the comptroller. Plaintiff contends that it is entitled to interest on that sum of $200,000 from the date when the Public Service Commission certified to the city that the contract work had been completed, to the date of payment. The decision as to this item necessarily follows the ruling I have made in respect of the interest claims I have already passed upon, and this interest claim is accordingly disallowed. In respect of interest on the remainder, or $257,500, the decision depends upon the construction to be given to certain provisions of several of the articles of chapter IV of the contract, principally those contained in article XXXI. That article reads as follows:

" Article XXXI. If at any time when the Contractor shall otherwise be entitled to a return of the said deposit, there shall be pending any claim for injury or alleged injury to person or property occurring or alleged to have occurred on account of the work hereunder, whether by reason of the negligence, fault or default of the Contractor or otherwise, or any claim for infringement or alleged infringement of patents, for which it shall be claimed that the City shall be liable, then and in that case the said deposit or such part thereof as the Commission may prescribe shall, upon the requirement of the Commission, be reserved by the Comptroller for a reasonable time as security to the City against such claims. And the amount of any such damages or costs paid by the City to others or for which the City shall be liable to others shall be deducted from the said deposit before the same shall be returned to the Contractor as hereinafter provided. For the purpose of making such deduction the Comptroller may sell any of the securities which may constitute part of such deposit in the manner provided in article XXX."

It is contended for the plaintiff that article XXXI refers exclusively to claims in which it was sought to fasten liability upon the city, and that, as concededly there were no such claims

pending, the city was not warranted in withholding moneys or securities held at the completion of the contract work. It is argued by the corporation counsel that the article in question should be construed as referring not only to claims against the city, but also to claims against the contractor in which the city was interested solely for the purpose of insuring the protection of those claiming to have suffered personal or property injury by accidents occurring during the prosecution of the contract work. (*Schnaier* v. *Bradley Contracting Co., supra.*) Certain language in the article, and in the other articles of chapter IV, lends support to both contentions, but I am of the opinion that I am not required to construe the article in respect of that point. Not only is it conceded that the Public Service Commission did not require the reservation of any moneys, but the proof is that the Commission in effect certified that such reservation was unnecessary; and as I read the article, and the other provisions of chapter IV, the city's right to reserve was made expressly dependent upon the opinion of the Commission, in certificate form, that such reservation was necessary or advisable. I am of the opinion, therefore, that the plaintiff is entitled to interest at the rate of six per cent on this item of $257,500 from the date of the plaintiff's demand upon the comptroller to the date when the sum of $256,500 was turned over, in cash and securities, to the plaintiff, less the amount of coupon interest paid over by the city to the plaintiff, as received, on the bonds or corporate stock held by the city as part of the security fund. The deduction of $1,000 from the sum of $257,500 is made necessary by the conceded fact that, for some unexplained reason, the city in turning over the bonds omitted to include one bond of $1,000, which bond, it seems, has been lost or mislaid. The plaintiff is entitled to the value of that bond, as on the theory of conversion, with interest to date, at six per cent, from the date when the other bonds were turned back to plaintiff. The corporation counsel contends that if interest is to be allowed on the $257,500 item, it should be at the rate of four and one-half per cent (less coupon interest) because of certain provisions of article XXXIX. Those provisions do not, however, as I read them, refer to a situation such as we are presently dealing with, but have reference only to delayed payments for moneys earned under the contract, when or if the Public Service Commission shall have transmitted to the city certain vouchers provided for in article XXXVIII.

I request counsel to proceed with all reasonable haste to compute interest on the allowed claims, and to submit to each other compilations of principal and interest to follow my findings, so that

I may be saved the labor of ascertaining the amount for which a verdict should be directed. In case there have been reservations of decision upon questions as to which either counsel may desire a formal decision, I shall make rulings if so requested.